350 So.2d 718 (1977)
Olynn Kenneth BURNETT, Jr.
v.
STATE.
6 Div. 316.
Court of Criminal Appeals of Alabama.
August 16, 1977.
Rehearing Denied October 4, 1977.
*719 Walter Joe James, Jr., James & Lowe, Haleyville, for appellant.
William J. Baxley, Atty. Gen., and Elizabeth N. Petree, Asst. Atty. Gen., for the State.
BOWEN W. SIMMONS, Retired Circuit Judge.
Appellant-defendant, a non-indigent represented here and at nisi prius by employed counsel, was indicted for assault with intent to murder, convicted therefor with punishment fixed by the court at twenty years imprisonment.
The alleged offense took place on January 11, 1976, not far from Haleyville, in Winston County. The time was about 11 p. m. The victim was a deputy sheriff.
At the same time of the preceding incident, defendant allegedly shot and killed another person. Deputy Sheriff Dennis Rowe, who, along with the victim in the instant case, Chuck Thompson, was on night patrol duty in Winston County.
The two offenses occurred at or near a motel building formerly owned by defendant's deceased father.
We think it is clear from the evidence taken on defendant's motion for a change of venue that defendant, his father, who was killed a short while before January 11, 1976, in a truck accident, and also defendant's step-mother, along with one or two others, were engaged in the illicit sale of alcoholic beverages and used this motel building as headquarters, more or less, for these illicit operations.
These operations naturally invited the two officers, Rowe and Thompson, to patrol that area in quest of law violations. However, the shooting occurred when the officers stopped near the motel to check a young man who had driven his car in a ditch. They had just checked the young man's driver's license, when, according to the evidence of Thompson (presented at the main trial), defendant passed them, stopped and backed up. That is when the shooting occurred. So far as the evidence of Thompson reveals, neither he nor Rowe had drawn a gun when defendant fired his pistol at the head of Rowe and fatally wounded him. Then he fired at Thompson at close range, and, as he retreated, fired some more shots at Thompson who ducked and returned the fire. Neither Thompson nor defendant was hit by the exchange of shots. Thompson contacted fellow officers who went to the scene where Rowe lay fatally wounded.
It appears from the record that defendant was tried on May 17, 1976, and given life for the murder of Rowe. Defendant's case for the offense against Thompson was also set on the same day, May 17, 1976, but continued by the court ex mero motu until June 28, 1976, at which time it was tried.
It also appears in the record that a qualified jury was selected for the trial of the *720 murder case, and some jurors were excused because they were not qualified. The remaining jurors were brought back for trial of the instant case reset for trial on June 28, 1976. No objection was made to these returning jurors because of this procedure. We therefore pretermit writing thereto.
We note that in both cases defendant filed timely motions for a change of venue. In this opinion we only consider the motion for such change and a continuance in the instant case and not the motion in the murder case.
A jury was selected from the returning jurors who rendered a verdict of guilt of assault with intent to murder. They deliberated thirteen minutes.
We also note that the State put up only one witness, Chuck Thompson, who testified positively that defendant fired the fatal shot at Rowe and also shot at him. Defendant did not take the stand or offer any evidence. The only issue here presented and argued by appellant is the denial of his motion for a change of venue and for a continuance.
We now advert to the motion for a change of venue and the Court's denial of the motion.
We first note that the 1970 population of Winston County was 16,654 with something like a two to four thousand subsequent increase. A majority of the people live on the west side of the county where Haleyville is located.
Winston County is served by one local newspaper, the Northwest Alabamian, which is published at Haleyville. It is distributed throughout Winston County and other areas.
The county is also served by the Birmingham News, which had at the time a daily circulation of about 1,000 and a Sunday distribution of about 1,500 in Winston. News was also disseminated by television and radio from Birmingham; as well as a radio station in Winston. All this media covered news items about the homicide and the assault on Thompson. The Birmingham News items about the shooting were saturated with assertions, the product of inquiries addressed to some officers and some unreliable communicants, that certain criminal elements were run out of Tennessee by the late Buford Pusser, an alert, active and courageous sheriff in the area, and found lodgment in Winston County; that they were spearheaded by the deceased Burnett, with the aid of his wife and defendant. In other words, the news stories in the Birmingham News, with prominent space coverage, were circulated to impress the readers that Winston County was a haven for law violators under the direction and control of the Burnett family. These publications about such an orgy of crime in Winston County only lasted about three days right after the shooting incident. Thereafter, there was only an occasional reference to the shooting. These later references were free of a sensational tone.
The local paper covered news items about the homicide that were ample in coverage, but reasonably free of sensational tones and did not implicate the Burnett family as the leaders of a crime gang from Tennessee. We think it is undisputed that the Burnetts were freely bootlegging alcoholic beverages with headquarters at the motel which burned after the shooting incident. The cause of the fire does not appear in the record. It can be said with certainty that the Burnetts were not engaged in any church related activities.
It further appears that some interested person went so far as to call on the Attorney General to intervene and take charge of the alleged crime situation in Winston. In other words, we are certain that the shooting incident created a furor among the law enforcement officers of Winston and probably among some of the officers of neighboring counties. A reasonable inference may be drawn that the incident and the attendant media publicity created, temporarily at least, widespread resentment among the law abiding people in Winston against the Burnett family conduct.
It further appears that some substantial citizens of Winston, right after the shooting, spearheaded public solicitations of money *721 to help pay the funeral expenses of Deputy Rowe. These solicitations were made both in Haleyville and Double Springs by contacting different citizens in the respective area of each town. Several hundred dollars for such expenses were contributed.
When the funeral procession of the deceased officer was set up, it was escorted, in the judgment of the witness, the funeral director, by 60 to 75 peace officers, including the sheriff's department and the Highway Patrol, who led the procession.
It also appears from the evidence that the funeral procession deviated from the usual route and circled around the business Mall at Haleyville, except the east end of the Mall. The witness said he followed the procession and that he had no instructions from the family to make this deviation. It was not the shortest route to Addison where the body was interred. The witness said it was the largest body of officers attending a funeral that he had ever seen in his lifetime. After leaving Haleyville with the body the procession proceeded to Double Springs (the county seat) and circled the courthouse, then to Addison. The procession traveled approximately thirty-six miles. The witness further testified that the detour around the Mall in Haleyville and around the courthouse at Double Springs were the only deviations from the normal and logical route from Haleyville to Addison.
Despite the notoriety resulting from newspaper publications, the radio and television broadcasts, and the funeral procession, there were substantial evidentiary assessments by witnesses that defendant could obtain a fair and impartial trial in Winston County.
R. L. Shirley, News Editor of the Northwest Alabamian, who lived in Haleyville, testified for defendant (R. 206), and said that the wild reporting would not affect him if he were on the jury, that he would go with the evidence, and that in his opinion defendant could get a fair trial.
John Slatton, operator of the radio station in Haleyville, called as a witness by defendant, testified (R. 266) that he believed there were other people in Winston County who agreed with his views about being able to render a fair and impartial verdict, but that there is some prejudice anywhere in every case.
Larry Brewer, called by defendant, a resident and mayor of Double Springs, employed by Winston Industries; and, who assumed some responsibility in raising funeral funds, testified (R. 258) that even though he did not see all the news media, he felt defendant could get a fair trial.
Don Thrasher, owner and publisher of the Northwest Alabamian, testifying for defendant as to the circulation of his paper, also stated (R. 218) that he believed defendant could get a fair trial in Winston County.
Sylvester Crittenden, a retired grocery merchant in Double Springs, called by defendant, testified (R. 396) that despite the publicity, if he were called for jury duty he could render an impartial verdict.
Owen Alford, a resident of Winston County all his life, called by the State, testified (R. 402) that he believed a jury could be empanelled in Winston that would give defendant a fair and impartial verdict.
Henry McNutt, a dairy operator, eight to nine miles west of Haleyville, testified that he could render a fair and impartial verdict if he were called to sit on the jury to try defendant (R. 414), and he wouldn't be influenced by all the publicity.
Early Hilton, called by the State, a long-time resident of Winston, testified that he believed (R. 426) a jury of twelve people could be empanelled in Winston County that would render a fair and impartial verdict "toward defendant."
Theo League, called by the State, a resident of Winston County all his life, testified that he could render a fair and impartial verdict.
O. V. Walker, testifying for the State, born in 1916, and since birth been a resident of Winston County, testified (R. 436) that he felt the Court could empanel a Winston County jury that would render a fair and impartial verdict in defendant's case.
*722 Defendant offered in evidence questionaires with verified answers, dated in April, 1976, that had been submitted to fifteen residents of Winston County, that contained question "O", (R. 58), as follows:
"(o) Do you think the feeling in Winston County against the defendant is so deep and widespread that it might interfere with his right to have a fair and unbiased jury decide his guilt or innocence?"
Responding to this question, twelve residents answer "yes," one answered "no," and one answered "don't know."
So, we have according to all the evidence, supra, a diversity of opinions on the issue of a fair trial in Winston County.
It is to be noted that the trial judge was presiding in his own circuit and was not a visiting judge. He, in a sense, was at home and no doubt was familiar with existing sentiment in the county and the extent of any hostile atmosphere toward defendant, to the end that it might preclude him from obtaining a fair trial and an unbiased verdict. Donald v. Matheny, 276 Ala. 52, 158 So.2d 909(7), 99 A.L.R.2d 1241. The trial judge was in position to evaluate any existing sentiment adverse to defendant's right to a fair and unbiased jury panel to try his case. The record before us is in conflict among the witnesses as to the issue of a fair trial.
The news media has certain constitutional rights of a free press. The line of demarcation between the rights of the news media and those of defendant to a fair trial often is at times an issue that presents difficulties. Society has certain rights that require protection.
We observe that by stipulation the record in the murder trial of appellant was incorporated into the instant record. It sets out an extensive examination of the members of the jury panel. (R. 442-472). Five prospective jurors who stated that the publicity would enter into their minds were excused (R. 469-472). The remaining venire indicated they could decide the case in a fair and impartial manner. (R. 459, 460, 466, 468).
In the instant case an examination of this panel revealed that all the returning jurors had heard the results of appellant's murder trial. One juror, who was excused, acknowledged that this information would tend to prejudice him. Another one was excused because he did not think he could give a true verdict in the case.
Appellant's counsel inquired of the jurors if they knew of any reason why they could not render a fair verdict based on the evidence coming from the witness stand. There was no response.
The Court asked the jury whether any of them had heard of the results in the murder case tried on May 17, 1976. The response indicated all had heard (R. 128). Then the jurors who had expressed a fixed opinion during the examination of June 28, 1976, were also excused (R. 123).
It appears in the record that the Court took extra pains, and permitted the lawyers to do so, to screen the panel and exclude jurors who expressed they were influenced by the publicity and expressed a doubt about rendering a fair and unbiased verdict due to the publicity. The record contains three volumes, most of which relates to the publicity and screening the jurors.
Although there appears to have been considerable and widespread news media publicity concerning the cases and about defendant's family background as related to crime, such publicity does not necessarily constitute grounds for a change of venue. Payne v. State, 48 Ala.App. 401, 265 So.2d 185(3).
A motion for a change of venue, as on motion for a new trial, as a general proposition of law, is addressed to the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of abuse of that discretion. Yoemans v. State, 55 Ala.App. 160, 314 So.2d 79(4, 5).
We have examined and read the entire record, and conclude from this independent examination or evaluation, as required in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), that the *723 trial court did not err in overruling the motion. There was no abuse of this discretion.
It is to be noted again that the news media, particularly the Birmingham News articles covering the hearsay statements about a criminal gang from Tennessee, were published in January, just a few days after the homicide and assault. The trial was not had in the instant case until June 28, 1976. Five months and about seventeen days had elapsed, thus providing time for the extreme emotions to subside and a return to normal. Nowhere in this record, that we have been able to find, do there appear any threats against the defendant, or a display of violence, individual or public, toward this defendant. No doubt that in the minds of some a resentment against lawlessness and crime in Winston County did surface; which is generally the case when crime becomes too rampant. Throughout Alabama, then and at the present time, opposition to crime is more expressive and apparent than usual; but, such opposition does not find such inflexibility as to deny a defendant a fair trial.
The defendant failed to carry the burden and show to the reasonable satisfaction of the trial court that he could not receive a fair trial in that an unbiased verdict could not be reasonably expected. Yoemans, supra.
We have noted above that the jury deliberated only thirteen minutes before rendering a verdict. There was no particular reason for a prolonged deliberation. There was only one witness for the State. He testified positively as to facts showing guilt of defendant. This evidence was undisputed. Defendant did not testify; he offered no evidence.
The Court did not err in denying defendant's motion for a change of venue. The judgment of the Court is affirmed.
The foregoing opinion was prepared by the Honorable BOWEN W. SIMMONS, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of § 6.10, of the new Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.

ON REHEARING
BOWEN W. SIMMONS, Retired Circuit Judge.
Having carefully reviewed and considered the evidence appearing in the record, it is our independent judgment that the trial court was correct in denying defendant's motion for a change of venue.
OPINION EXTENDED; APPLICATION OVERRULED.
All the Judges concur.